STATE v. LARRY NEWSOME.

(Filed 9 May, 1928.)

**1. Criminal Law—Evidence—Confessions—What Constitutes Promise or Threat.**

Only free and voluntary confessions of one accused of crime, uninfluenced by a promise of favor or a threat, are competent on the trial as evidence against him, but a confession is not rendered involuntary because made to officers of the law having the defendant under arrest at the time.

**2. Same.**

Confessions of a defendant while under arrest are not rendered inadmissible at the trial on the ground that at the time of his making them the officers of the law having him in custody assured him that they would protect him from mob violence feared by him.

**3. Same—Confidential Communications—Physicians and Surgeons.**

The admissions of one accused of crime are not rendered confidential within the meaning of the law when made to a psychiatrist examining him by order of the court in order to form an opinion as to whether the defendant had sufficient mental capacity to be in law guilty of crime, since, under the circumstances of this case, the relationship of physician and patient did not exist, and C. S., 1798 is not applicable.

**4. Same—Cured Error—Instructions.**

Where the evidence is cumulative as to the confessions of one accused of crime, the error, if any, in the admission of evidence of one of the confessions, is cured by the trial court when he clearly withdraws the evidence from the consideration of the jury.

**5. Homicide—Murder—Murder in the First and Second Degrees—Elements Thereof—Instructions—Presumptions.**

Where all the evidence at a trial for murder tends to show murder in the first degree in that the murder was committed by poisoning, starvation, lying in wait, imprisonment, torture, or in the perpetration or attempt to perpetrate a felony, the trial court may instruct the jury that they may render only one of two verdicts, murder in the first degree, or not guilty. But where the evidence tends to show that the killing was with a deadly weapon, and the State in one phase of its case relies on premeditation and deliberation, the presumption is that the murder was in the second degree, with the burden of proving premeditation beyond a reasonable doubt on the State, in order to constitute it murder in the first degree, and under these circumstances it is error for the trial court to fail to charge the jury that they might find the prisoner guilty of murder in the second degree. C. S., 4642.

**6. Criminal Law—Appeal and Error—Assignment of Error—Defendant Must Assign Error to Have it Considered in the Supreme Court.**

The question as to whether the defendant is entitled to a new trial on the ground that the verdict was influenced by hostile demonstrations in

the courtroom during the trial, must be raised by the defendant by motion for a new trial and exception to the refusal of the trial court to grant same.

ADAMS, J., concurring, STACY, C. J., and BROGDEN, J., concurring in result; CLARKSON, J., dissenting.

APPEAL by defendant from *Grady, J.,* at December Term, 1927, of WAYNE. New trial.

Indictment for murder. Verdict: Guilty of murder in the first degree.

From judgment on the verdict, that defendant suffer death as provided by statute, defendant appealed to the Supreme Court.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*
*Madrid B. Loftin for defendant.*

CONNOR, J. The lifeless body of Beulah Tedder was found by her father, Alex Tedder, between 6:30 and 7 o'clock p. m. on Thursday, 8 December, 1927, lying beside a path, thirty-five or forty yards from his home, in Wayne County, N. C. The path beside which the body was found runs from the home of Cora Reid to the home of the father of the deceased. She was lying flat on her back, with her head turned to one side, and with one leg drawn up under her body. Her dress was thrown back towards her shoulders. Her throat was cut; there were also cuts on her cheeks, her arms and her hands. The evidence tended to show that these cuts were made with a knife, at or near the place where the body was found, by some person who, at the time, was assaulting her with a knife and that she was attempting to escape from her assailant. The county physician who examined the body the next day after it was found by her father, about 10 o'clock a.m., testified that from his examination he was convinced that the deceased had not been ravished. She was a strong, well-developed girl, about fourteen years of age, weighing about 115 pounds. There was no evidence tending to show that the deceased had been ravished, or that the homicide had been committed in the perpetration of a rape upon the deceased.

The deceased was the oldest child of her father's family. She had left his home that evening about 6 o'clock with Cora Reid, a neighbor, whose home was at a distance of about 2,200 feet from her father's home. She went with Cora Reid to her home, at her father's request, to get some home-made syrup for the family. After she and Cora Reid arrived at the home of the latter, the deceased remained there for about five minutes. She then left, with the syrup, going in the direction of

her father's home, along a path near which, at a distance of about 1,000 feet from the home of deceased's father, was situate the home of defendant, Larry Newsome. There was evidence tending to show that defendant was at his home, when deceased and Cora Reid passed the same, going to the home of the latter, walking together along the path, and that defendant saw them as they passed. He knew that deceased would later return to her father's home, by this path, alone. There was evidence tending to show further that defendant waylaid the deceased as she was returning from the home of Cora Reid to the home of her father, about 6 :30 o'clock, and that he killed her by cutting her throat with a knife.

There was also evidence tending to show that defendant met the deceased, as she was returning from the home of Cora Reid to her father's home, near defendant's home, and that he then and there assaulted her, with intent to commit rape upon her. This assault, made about 125 to 140 yards from the place at which the body of the deceased was found, was not successful. The deceased broke away from defendant and ran toward her father's home. There was evidence tending to show that defendant pursued her with intent to commit rape upon her, and that he overtook her; that defendant killed her by cutting her throat with a knife, while attempting to perpetrate upon her the crime of rape.

There was evidence tending to show further that when defendant failed in his attempt to commit rape upon the deceased, at the time of his first assault upon her, because of her successful resistance, he abandoned his purpose to rape her, and that deceased escaped and ran from him; that as she was running toward the home of her father, she called to defendant, saying that she would tell her father of defendant's assault upon her, as soon as she arrived at his home; that defendant then pursued her a distance of 125 to 140 yards from the place where he first assaulted her, overtook her and again assaulted her with a knife with no intent to rape her, but with intent to prevent her from telling her father of the previous assault with intent to commit rape; that while making this latter assault upon deceased, defendant cut her throat with a knife, thus causing her death.

No evidence was offered by defendant; on cross-examination of witnesses for the State, defendant's counsel, assigned by the court to defend him in this action, sought to show that defendant's mental condition is such that he is not capable of committing crime. These witnesses testified that while in their opinion defendant is a man of low mentality, with the mind of a child of immature years, he had sufficient intelligence to know and did know right from wrong, and that he was capable of appreciating and did appreciate the moral quality of his acts. The sheriff of Wayne County, on his cross-examination as a witness for the State, testified "that he had been with the prisoner right much, while

riding backwards and forwards, between different places; that in his opinion there are lots of people who have more sense than the defendant, but that defendant has plenty of sense to know right from wrong, and that defendant, in his opinion, has the intelligence of the average negro, without any education." Dr. W. C. Linville, psychiatrist for the State Hospital at Goldsboro, testified for the State that he had examined the defendant, since his arraignment upon the indictment in this action, in order to form an opinion as to his mental condition, and that in his opinion, formed as the result of such examination, defendant was at the time of the examination and also on the day of the homicide, sane. This witness on his cross-examination by counsel for defendant testified that defendant should be classed as a high-grade moron; that a high-grade moron is one whose mental faculties are undeveloped. On his redirect examination, the witness defined a moron as "a man without any education, a man with very poor training in life, and very poor ideas of law and order."

The only objection made by counsel for defendant to evidence offered by the State were directed to testimony of witnesses as to alleged confessions made to them by defendant, after his arrest, and while he was in the custody of the sheriff or his deputies. Two of these witnesses, J. R. Kornegay and Carl Smith, were deputy sheriffs of Wayne County. The other witness was Dr. W. C. Linville, the psychiatrist, who examined the defendant for the purpose of qualifying himself to testify as to the mental condition of defendant, at the time of the homicide. Each of these witnesses testified that the confession made to him, or in his presence, was voluntary on the part of defendant, and was made without promise or threat to defendant. The court overruled the objections, and defendant, having duly excepted upon his appeal to this Court, assigns the admission of testimony tending to show confessions by him as error.

With respect to the testimony of witnesses as to confessions of defendant, the court instructed the jury as follows: "Right here I want to say, and I feel it is my duty to say it: A confession of a prisoner who is charged with crime cannot be offered in evidence and received by the court and considered by the jury unless such confession is absolutely free and voluntary on the part of the person making it. If a person charged with crime is offered any inducement to confess, if any promises are made to him, or if he is threatened by any person, and under such threats, or by any coercion exercised upon him, he makes any admission or confession, the humanity of the law of this State will not permit that confession to be received in evidence. So in reference to the statements testified to by Mr. John Kornegay as to what the defendant told him after he left the penitentiary, and while he was on his way to Goldsboro:

I charge you not to consider any statement made to him, because after giving to his evidence mature thought and consideration I have decided that the promise that he made to the defendant while in the penitentiary that he would protect him, was there to protect him, was such a promise as would make any confession inadmissible in a court of justice. So when you go to make up your verdict, I charge you not to consider anything that Mr. Kornegay said as to confession made to him, or anything Mr. Carl Smith said as to confessions made to Mr. Kornegay while he was on the way from Raleigh to Goldsboro. However, this does not apply to the testimony of Dr. Linville. This testimony on the part of Dr. Linville as to what the defendant said to him, I consider competent evidence and it is permissible for you to consider it when you go to make up your verdict."

If the testimony of the witnesses, Kornegay and Smith, deputy sheriffs of Wayne County, as to statements, in the nature of confessions, made by defendant to the witness Kornegay, in the presence of the witness Smith, was incompetent and inadmissible as evidence against the defendant, for that said statements were made by the defendant in reliance upon assurances of the deputy sheriffs that they would protect him while he was in their custody, and if it was, therefore, error to overrule defendant's objections to the admission of this testimony, when same was offered by the State, such error was rendered harmless by the withdrawal of the incompetent testimony from the consideration of the jury in the charge. There was sufficient evidence other than the testimony as to confessions from which the jury could find that defendant is the man who killed deceased, by cutting her throat with a knife, and that the homicide was committed, either by lying in wait, or in the attempt to perpetrate a felony—to wit, rape, or after deliberation and premeditation by the defendant. The testimony as to the alleged confessions was cumulative as evidence with respect to these matters and its withdrawal from the jury rendered the error in its admissions, if any, harmless.

The principle upon which defendant's assignments of error with respect to the testimony of the witnesses Kornegay and Smith as to confessions made by defendant, are not sustained, is stated by *Adams, J.,* in *Hyatt v. McCoy,* 194 N. C., 760, as follows: "The admission of improper or incompetent evidence which is withdrawn from the jury and stricken out will not constitute reversible error, especially where the jury is particularly instructed not to consider it or to be influenced by it in making up the verdict." This principle has been applied by this Court not only in appeals in civil actions, as appears by the cases cited by *Adams, J.,* in *Hyatt v. McCoy,* but also in appeals in criminal actions. *S. v. Dickerson,* 189 N. C., 327; *S. v. Lane,* 166 N. C., 333; *S. v. Flemming,* 130 N. C., 688; *S. v. Ellsworth,* 130 N. C., 690; *S. v. Apple,*

121 N. C., 584; *S. v. Collins,* 93 N. C., 564; *S. v. May,* 15 N. C., 328. In the last cited case, *Ruffin, C. J.,* says: "If improper evidence be received, it may afterwards be pronounced incompetent, and the jury instructed not to receive it." In *S. v. Lane, supra, Walker, J.,* after restating the principle and applying it to an assignment of error in that case, says: "We cannot assume that the jury disobeyed the court's instruction, and considered the evidence, but we must presume the contrary, unless prejudice appears or is shown by the appellant in some way. The burden is on him to prove it. *Rush v. Steamboat Co.,* 67 N. C., 47; *Thomas v. Alexander,* 19 N. C., 385." In the instant case, there was evidence, other than the testimony of the witnesses Kornegay and Smith as to defendant's confessions, from which the jury could find that defendant is the man who killed deceased, and that he killed her as contended by the State, under circumstances that make the homicide, under the statute, murder in the first degree. The clear and full statement in the charge to the jury of the principles applicable to the admission of testimony tending to show confessions by the defendant, as evidence against him, and the vigorous language used by the learned judge in the instruction, withdrawing the testimony, and directing the jury not to consider it, cured the error, if any, in the admission of the testimony over the objections of defendant.

The fact that defendant was in the custody of the deputy sheriffs of Wayne County, who were taking him from the State's prison at Raleigh to Goldsboro, for trial, at the time he made the statements offered in evidence as confessions, does not render such statements incompetent and inadmissible as evidence against the defendants. This fact alone does not show that the confessions were involuntary. This is well settled by numerous decisions of this Court. *S. v. Bowden,* 175 N. C., 794; *S. v. Lowry,* 170 N. C., 730; *S. v. Lance,* 166 N. C., 411; *S. v. Jones,* 145 N. C., 466; *S. v. Exum,* 138 N. C., 599. In *S. v. Gray,* 192 N. C., 594, we said: "We are not aware of any decision which holds a confession, otherwise voluntary, inadmissible because of the number of officers present at the time it was made. Nor has the diligence of counsel discovered any." The assurance given to defendant by the officers before they left the State's prison, that they would protect him while he was in their custody, on the way to Goldsboro, cannot be held as an inducement to defendant to make statements to the officers with respect to the crime with which defendant was charged after they had left Raleigh, and while they were on the way to Goldsboro. This assurance was given to defendant, manifestly, because of apprehension expressed by him to the officers, that he would be attacked and subjected to violence after he had left the protection of the State's prison. The presiding judge withdrew from the jury the testimony of the witnesses Kornegay and Smith,

as to defendant's statements to them, in the nature of confessions, evidently out of abundant caution, and because of his earnest desire that the defendant should not be prejudiced by testimony of confessions, as to the competency of which he had, after much reflection, some doubt. Upon the facts disclosed by the evidence, we do not think that there was error in overruling defendant's objections to the introduction of this testimony. We find no evidence showing that the statements made by the defendant to the officers, and offered by the State as confessions by him were otherwise than voluntary. But even if there was error in overruling the objections to this testimony when the same was offered, the error was cured by the withdrawal of the testimony in the charge to the jury.

The assignment of error based upon defendant's exception to the refusal of the court to sustain his objection to the testimony of Dr. Linville, as to statements made to him by defendant, offered in evidence as a confession by defendant, presents a more difficult question than that presented by the first and second assignments of error. It appears from the testimony of Dr. Linville that he is by profession a psychiatrist, and that he examined the defendant in a professional capacity. It does not appear, however, from his testimony, or from any other evidence before the court at the time defendant's objection was under consideration, at whose instance or at whose request, the examination of defendant was made by Dr. Linville. It does appear from a memorandum, filed in the record by the trial judge, and included in the case on appeal, as settled by him, with respect to an incident which occurred during the trial, having no connection, however, with this assignment of error, that counsel assigned by the court to defend the prisoner in this action visited the prisoner in jail, and that after a conference with him, advised the court that the only defense which they could possibly interpose in behalf of the prisoner was that of mental irresponsibility. Thereupon, at the request of counsel for defendant, the court communicated with Dr. Linville, the psychiatrist at the State Hospital for the Insane, at Goldsboro, and requested him to examine the prisoner, in order that he might form an opinion as to his mental capacity. The examination was made by Dr. Linville, in accordance with this request. Dr. Linville was thereafter called as a witness at the trial, and examined in behalf of the State. Defendant objected to testimony of this witness as to statements made to him by defendant, in the nature of confessions, while defendant was under examination by the witness, as a psychiatrist. The objection was overruled, and defendant excepted.

Dr. Linville testified that he examined the defendant on Saturday afternoon, about 1:30 o'clock; that he made a complete physical examination, and found no trouble with his heart, his lungs or his abdomen,

but found a few minor defects such as might be found in an average person. He further testified as follows: "In my mental examination, I asked him about his past life, his occupation, and various incidents in his life. He told me that he had never had any disease, except the flu. He suffered from the flu for a short time. He seemed to know every thing in his past life, even the most minute details. He said he has staggering spells. I asked him if he lost consciousness at such times, and he said, 'Not as I know of.' I asked him about his father, and he said that his father also suffered from staggering spells. He said that they never fell or hurt themselves, but had kind of giddy feelings. I asked him about this occurrence which had just happened. He told me in detail of this occurrence. The examination was conducted in the presence of a deputy sheriff."

The witness was then asked if the defendant made a statement to him about the murder with which he was charged; he replied that he did. The witness then testified that he made no offer or inducement of any kind to defendant, nor did he threaten or coerce the defendant in any way; that defendant's statements to the witness were voluntary, and made in reply to questions asked him by the witness as to what caused him to commit the crime.

The witness then testified, subject to defendant's exception, as follows: "I asked him what caused him to do this, and he said 'I don't know.' I asked him if he cut the girl immediately after he came up with her. He said he did not; that he seized her around the waist, and she fought him off and ran from him. He said that he cut her after he caught up with her; that he cut her because she said she was going to tell her father."

There was no error in holding that the statements made by defendant to Dr. Linville, as testified by him, were voluntary. No promise was made to defendant to induce him to make the statements, nor was any threat used to extort the statements from the defendant. *S. v. Bridges,* 178 N. C., 733; *S. v. Bohannon,* 142 N. C., 695. The testimony of Dr. Linville was therefore competent, and properly admitted as evidence of a confession by defendant, unless the statements were privileged under the provisions of C. S., 1798. If the statements were privileged under this statute, then in the absence of a finding by the presiding judge, duly entered upon the record, that the testimony was necessary to a proper administration of justice, it was incompetent, and upon defendant's objection should have been excluded. *Ins. Co. v. Boddie,* 194 N. C., 199. Upon the facts, however, appearing upon the record in this case, we are of opinion that C. S., 1798, is not applicable. It does not appear that the relation of physician and patient, within the meaning of the statute, existed between Dr. Linville and the defendant, at the time the state-

ments were made, nor that the information thereby obtained by Dr. Linville was necessary to enable him to prescribe for the defendant as his patient. It does not appear that defendant, at the time of the examination, was informed or knew that Dr. Linville had been requested to make the examination by his counsel, and that he relied upon the relationship of physician and patient, in making the statements. It is only when the relationship of physician or surgeon and patient has been established between the parties, and statements are made by the latter to the former, in reliance upon this relationship, for the purpose of affording information to the physician to enable him to prescribe treatment for the patient or to enable the surgeon to do some act for him as a surgeon, that the statute renders the statements inadmissible as evidence against the patient. Even then the judge may compel a disclosure by the physician or surgeon, if in his opinion the same is necessary to a proper administration of justice. See *Ins. Co. v. Boddie, supra.* It has been held in other jurisdictions that no professional relation precluding a disclosure of information acquired arises where a physician employed for that purpose alone makes an examination of a person charged with crime in order to pass upon his sanity, or to search for physical symptoms bearing upon his guilt or innocence. 40 Cyc., 2382 and cases cited. In the absence of evidence showing that a defendant in a criminal action, under examination by a physician for the purpose of enabling the physician to form an opinion as to his mental capacity, made statements in the nature of confessions, in reliance upon the relationship of physician and patient, it would seem that such statements are not privileged under our statute. C. S., 1798. Certainly they are not privileged, unless the relationship exists at the time the statements are made. It cannot be held upon the facts appearing on this record, that the relationship of physician and patient existed between Dr. Linville and the defendant at the time the alleged confession was made by defendant. Defendant's third assignment of error cannot be sustained.

The trial judge, in his charge to the jury, after stating in a plain and correct manner the evidence given in the case, and declaring and explaining the law arising thereon, as required by C. S., 564, gave the following instructions to the jury:

"I charge you that if you are satisfied from this evidence, and find beyond a reasonable doubt, that is, to a moral certainty, that the defendant killed Beulah Tedder, while lying in wait, or that he killed her while attempting to commit rape upon her person, or if not in either of these instances, that he killed her after premeditation and deliberation, as I have defined those terms to you, it would be your duty to return a verdict of guilty of murder in the first degree; but if you are not so satisfied, it would be your duty to return a verdict of not guilty."

STATE v. NEWSOME.

"In this case I do not see and cannot arrive at any conclusion that would lead me to leave with you the question of his guilt upon charge of second degree murder or manslaughter; I therefore charge you that you can return but one of two verdicts in this case—either murder in the first degree, or not guilty."

The defendant excepted to the last instruction and assigns same as error. He contends that under the law of this State, as enacted by the General Assembly and as declared by this Court, and upon the evidence submitted to the jury in this case, it was error to instruct the jury that they could return only one of two verdicts—guilty of murder in the first degree, or not guilty; that the jury should have been instructed that although they should find from the evidence, beyond a reasonable doubt, that defendant killed the deceased with a deadly weapon, if they did not find further from the evidence, beyond a reasonable doubt, that he killed her while lying in wait, or in the attempt to perpetrate upon her person the crime of rape, they should return a verdict of guilty of murder in the second degree, unless they should find further from the evidence, beyond a reasonable doubt, that defendant killed the deceased after premeditation and deliberation, as those terms had been defined in the charge; that only upon such finding could the jury return a verdict of guilty of murder in the first degree, if they had failed to find that the murder was perpetrated by lying in wait, or in the attempt to commit the crime of rape. These contentions present a serious question which it is the duty of this Court to decide, in accordance with the law as enacted by the General Assembly of the State, and as heretofore declared in authoritative decisions of this Court. The rights not only of the defendant in the instant case, but of every person who may hereafter be called upon to answer a charge of murder in the courts of this State are involved in our decision.

In his charge, the court had correctly instructed the jury that they were not bound by the testimony of any particular witness or class of witnesses. He had said to the jury: "You are not bound to believe any witness or class of witnesses; but it is for you to say, after giving to the testimony of any witness that degree of scrutiny to which you think it is entitled, what weight you will give to such testimony when you retire to your room." It is for the jury to determine whether they believe or disbelieve all or any part of the testimony of a witness; they are the sole judges not only of the weight of the evidence, but also of the credibility of the testimony. "No judge, in giving a charge to the petit jury, either in a civil or criminal action, shall give an opinion whether a fact is fully or sufficiently proven, that being the true office and province of the jury." C. S., 564. This statute was enacted in 1796; it has been in full force and vigor since its enactment. The wisdom of the policy upon

36—195

which it was enacted and in accordance with which it has since been maintained as the law in this State is not for the courts to determine.

Since the enactment in 1893 of the statute dividing murder into the first and second degree, and defining each degree of the crime, it has been uniformly held by this Court that a homicide committed with a deadly weapon is presumed to be murder in the second degree and that in the absence of evidence tending to show facts which under the statute make the homicide murder in the first degree, or, on the other hand, facts which reduce the homicide to manslaughter, the jury should be instructed that if they find from the evidence, beyond a reasonable doubt, that the killing was done intentionally and unlawfully with a deadly weapon, they should return a verdict of guilty of murder in the second degree. It is provided by statute that "nothing in the statute law dividing murder into degrees shall be construed to require any alteration or modification of the existing form of indictment for murder, but the jury before whom the offender is tried shall determine in their verdict whether the crime is murder in the first or second degree." C. S., 4642.

The decisions of this Court, subsequent to the enactment of the act of 1893, and prior to the decision in *S. v. Spivey,* 151 N. C., 677, at Fall Term, 1909, in appeals presenting the question as to whether upon a trial for murder, under the usual form of indictment, it is ever permissible for the trial judge to instruct the jury that upon all the evidence, if they believe the same and find therefrom the facts to be as all the evidence tends to show, they could return only one of two verdicts—guilty of murder in the first degree, or not guilty—left the answer to this question in some doubt. In *S. v. Gadberry,* 117 N. C., 812, the question was decided in the negative, although there were strong dissenting opinions by *Clark, J.,* and *Montgomery, J.* In the opinion for the Court by *Furches, J.,* concurred in by *Avery, J.,* it was held that since the act of 1893, where on a trial of one charged with murder, although the defendant introduced no evidence, and all the evidence for the State tended to show only murder in the first degree, it was error to instruct the jury that if they believed the evidence they should find the defendant guilty of murder in the first degree. In *S. v. Covington,* 117 N. C., 834, in the opinion by *Avery, J.,* for the Court, *Furches, J.,* having been of counsel in the court below, not sitting, it is said: "His Honor excluded from the jury the question of murder in the second degree and instructed them that in no view of the case as presented by the evidence was the prisoner guilty of murder in the second degree or manslaughter. To this the prisoner excepted. The charge is correct if there was no evidence of murder in the second degree or of manslaughter. The evidence relied upon by the State is the confession of the prisoner to the witness Josey and circumstances detailed by other witnesses tend-

ing to confirm it. Upon the truth or falsity of the confession the guilt of the prisoner entirely depends. If the confession of the homicide is a confession of murder in the first degree, and of neither manslaughter nor murder in the second degree, the charge is correct, for there is no evidence of either of these latter offenses. *S. v. McCormac,* 116 N. C., 1033."

However, in *S. v. Spivey,* 151 N. C., 677, *Manning, J.,* writing for a unanimous Court, says: "After a careful review of the decisions of this Court and a critical examination of the statute (Rev. 3631, now C. S., 4200, and Rev., 3271, now C. S., 4642), we deduce the following doctrine: Where the evidence tends to prove that a murder was done, and that it was done by means of poison, lying in wait, imprisonment, starving, torture, or which has been committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary, or other felony, and where there is no evidence and where no inference can be fairly deduced from the evidence of or tending to prove a murder in the second degree or manslaughter, the trial judge should instruct the jury that it is their duty to render a verdict of 'guilty of murder in the first degree,' if they are satisfied beyond a reasonable doubt, or of 'not guilty.' If, however, there is any evidence, or if any inference can be fairly deduced therefrom, tending to show one of the lower grades of murder, it is then the duty of the trial judge, under appropriate instructions, to submit that view to the jury."

The doctrine thus clearly stated is now and has since been the law in this State, with respect to this matter. *S. v. Gadberry* is expressly overruled in *S. v. Spivey.* In the former case all the evidence tended to show that defendant shot and killed deceased in an attempt to commit a felony, to wit, abduction. It is well settled, therefore, as the law of this State, that where all the evidence tends to show that defendant is guilty of murder, and that the murder was perpetrated by one of the means specified in the statute, or was committed in the perpetration of or attempt to perpetrate a felony, as defined in the statute, it is not error for the judge to instruct the jury that upon all the evidence, if they believe the same and find therefrom the facts to be as all the evidence tends to show, beyond a reasonable doubt, they should return a verdict of "guilty of murder in the first degree." In such case if defendant committed the murder, he is guilty of murder in the first degree, and the jury should so find by their verdict. In these instances the State is not required to prove deliberation and premeditation, because the means by which the murder was perpetrated, or the circumstances under which it was committed, show necessarily both deliberation and premeditation. When, however, the State relies upon evidence tending to show not only that the murder was

perpetrated by one of the means specified in the statute, or that it was committed in the perpetration of or attempt to perpetrate a felony as defined in the statute, but also upon evidence tending to show deliberation and premeditation, the jury should be instructed that if they fail to find from the evidence, beyond a reasonable doubt, that the murder was perpetrated by one of the means specified in the statute, or that it was committed in the perpetration of or attempt to perpetrate a felony, and further fail to find from the evidence, beyond a reasonable doubt, that it was committed after deliberation and premeditation, they should return a verdict of guilty of murder in the second degree, provided, of course, they shall find from the evidence, beyond a reasonable doubt that the defendant committed the murder. Deliberation and premeditation, if relied upon by the State, as constituting the homicide murder in the first degree, under the statute, must always be proved by the evidence, beyond a reasonable doubt. In such case, under the statute as construed by this Court, it is for the jury and not the judge to find the fact of deliberation and premeditation, from the evidence, and beyond a reasonable doubt. Premeditation and deliberation are always matters of fact to be determined by the jury, and not matters of law to be determined by the judge.

Applying these principles, we must sustain defendant's assignment of error based upon his exception to the instruction of the court to the jury. For the error of law, in said instruction, defendant is entitled to a new trial, and it is our duty, in the exercise of our appellate jurisdiction, conferred upon this Court by the Constitution of the State, to so decide.

It cannot be held as a matter of law that all the evidence in this case, and every inference fairly and reasonably to be drawn therefrom, required the jury to return a verdict of "Guilty of murder in the first degree," or of "Not guilty." A verdict of "Guilty of murder in the second degree" could have been returned by the jury under the law and the evidence in this case. The fact that the evidence fully justified the verdict as returned by the jury, does not affect the decision of the question which we are called upon to decide, upon this appeal. This Court has no jurisdiction to decide whether or not the defendant is guilty of murder as charged in the indictment, or, if guilty, whether he is guilty of murder in the first or second degree. We must decide only whether his assignments of error, duly presented upon his appeal, are sustained by the law of this State, as enacted by the General Assembly and declared by this Court. The decision of the trial court that, as a matter of law, upon all the evidence, defendant, if guilty, as charged in the indictment, is guilty of murder in the first degree, was error for which defendant is entitled to a new trial.

The court in its charge to the jury, had instructed them fully and correctly as to premeditation and deliberation, relied upon by the State, in part, to support its contention that defendant is guilty of murder in the first degree. The trial judge was of opinion that if the jury should fail to find beyond a reasonable doubt that the murder was committed by lying in wait, or in the attempt to perpetrate a felony, there was evidence tending to support the contention of the State that defendant killed deceased, with malice, after premeditation and deliberation; in this he was correct. But under the statute, whether or not the evidence established this fact, beyond a reasonable doubt, was for the jury to determine, and not for the judge. The distinction is not fanciful; it is vital. Upon this distinction rests the integrity of trial by jury, guaranteed by constitutional provision, and approved as the ultimate protection of the individual, in his rights of person and of property, by the experience of centuries.

Defendant further contends upon his appeal to this Court that he is entitled to a new trial, because of facts set out in a memorandum filed by the presiding judge, in the case on appeal, as settled by him, with respect to an incident which occurred during the progress of the trial. Defendant, while sitting in the bar, beside his counsel, was assaulted by the father and uncle of the deceased, with the evident purpose of taking him from the custody of the court. This assault was made during the examination of a witness for the State. Approval of the assault and of the purpose with which it was made, was manifested by persons in the court room. The purpose of the assault was promptly frustrated by the sheriff, who rescued defendant from his assailants. After the confusion in the court room, occasioned by the assault, had subsided, the trial proceeded in an orderly manner, resulting in the verdict, and judgment. No motion for a mistrial was made by defendant, nor does the record contain an exception to any ruling or decision of the court with respect thereto. There is therefore no assignment of error, which we can consider in the exercise of our appellate jurisdiction. Defendant contends, however, that upon the facts found by the judge, he should, of his own motion, have ordered a mistrial, and that it was error of law, for which he is entitled to a new trial, for the court to proceed with the trial, after this incident. We cannot so hold. We cannot hold that as a matter of law the presiding judge should have, without a request from defendant or his counsel, ordered a mistrial, because of this incident. It does not appear that counsel for defendant were intimidated by the assault upon defendant, or that they were deterred by the conduct of persons in the courtroom from making such motions as they thought the circumstances required for the protection of defendant's rights. The judge finds as a fact, as stated in the memorandum that, "during the foregoing demon-

stration the jury sat in perfect order and did not appear to be at all disturbed." In his charge to the jury, the court instructed them in strong and vigorous language that they should not be influenced by the assault or by the accompanying demonstration of approval in the court-room, in arriving at their verdict. There is nothing in the record which shows that the jury failed to respond, as intelligent men, sworn as jurors, to the admonition of the judge. We do not think that upon principle or upon the authorities defendant is entitled to a new trial upon this contention.

For the error in the charge, as appears in this opinion, defendant is entitled to a new trial. It is so ordered.

New trial.

STACY, C. J., concurring in result: There are just three observations which I wish to make in regard to this case:

First, with respect to the alleged confessions of the defendant: Confessions are of two kinds, voluntary and involuntary. Voluntary confessions are admissible in evidence against a defendant; involuntary confessions are not. A confession is voluntary in law when—and only when—it was in fact voluntarily made. *Ziang Sung Wan v. United States,* 266 U. S., 1, 69 L. Ed., 131. The voluntariness of a confession is a preliminary question to be determined by the judge in passing upon its competency as evidence. *S. v. Andrews,* 61 N. C., 205. And in deciding the question of its admissibility in evidence, the judge may hear the testimony of witnesses pro and con. *S. v. Whitener,* 191 N. C., 659, 132 S. E., 603. If an alleged confession is excluded, its competency cannot arise on appeal; but, if admitted, it may.

Second, as to the charge: When on the trial of a criminal prosecution it is permissible under the bill, as here, to convict the defendant of "a less degree of the same crime" (C. S., 4640), and there is evidence tending to support a milder verdict, the case presents a situation where the defendant is entitled to have the different views presented to the jury, under a proper charge, and an error in this respect is not cured by a verdict convicting the defendant of the highest offense charged in the bill of indictment, for in such event it cannot be known whether the jury would have convicted of a less degree of the same crime if the different views, arising on the evidence, had been correctly presented to them by the trial court. *S. v. Holt,* 192 N. C., 490, 135 S. E., 324; *S. v. Kline,* 190 N. C., 177, 129 S. E., 417; *S. v. Lutterloh,* 188 N. C., 412, 124 S. E., 752; *S. v. Allen,* 186 N. C., 302, 119 S. E., 504; *S. v. Williams,* 185 N. C., 685, 116 S. E., 736; *S. v. Merrick,* 171 N. C., 788, 88 S. E., 501; *S. v. Kennedy,* 169 N. C., 288, 84 S. E., 515; *S. v. Kendall,* 143 N. C., 659, 57 S. E., 340; *S. v. White,* 138 N. C., 704, 51 S. E.,

44; *S. v. Foster,* 130 N. C., 666, 41 S. E., 284; *S. v. Jones,* 79 N. C., 630.

Viewing the record in the light of these decisions and the principle they illustrate, I am convinced that there was error to the prejudice of the defendant in withdrawing from the jury's consideration the question of murder in the second degree.

When on a trial for homicide, a killing with a deadly weapon is admitted or established by the evidence, the law raises two—and only two—presumptions against the slayer: first, that the killing was unlawful; and, second, that it was done with malice; and an unlawful killing with malice is murder in the second degree. *S. v. Walker,* 193 N. C., 489, 137 S. E., 429; *S. v. Benson,* 183 N. C., 795, 111 S. E., 869; *S. v. Fowler,* 151 N. C., 731, 66 S. E., 567. The additional elements of premeditation and deliberation, necessary to constitute murder in the first degree, are not presumed from a killing with a deadly weapon. They must be established beyond a reasonable doubt, and found by the jury, before a verdict of murder in the first degree can be rendered against the prisoner. *S. v. Thomas,* 118 N. C., 1113, 24 S. E., 431. It is provided by C. S., 4200, that a murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree, punishable by death, and all other kinds of murder shall be deemed murder in the second degree, punishable by imprisonment in the State's prison. *S. v. Banks,* 143 N. C., 652, 57 S. E., 174.

Third, in regard to matters transpiring in the courtroom: Without deciding, as it is unnecessary to do so on the present record, whether the trial court could or should have ordered a mistrial *ex mero motu* (*S. v. Epps,* 76 N. C., 55), upon the facts stated in the memorandum attached to and made a part of the case on appeal, I am of the opinion that this Court, in the exercise of its appellate jurisdiction and general supervisory power over proceedings in the lower courts, has ample authority to deal with the situation, disclosed by the memorandum filed herein, and to order a new trial, if, in its judgment, the ends of justice require it. *S. v. Wilcox,* 131 N. C., 707, 42 S. E., 536; *S. v. Tilghman,* 33 N. C., 513; *Moore v. Dempsey,* 261 U. S., 86; *Frank v. Mangum,* 237 U. S., 309; *Sheppard v. State,* 141 S. E. (Ga.), 196. Indeed, in capital cases, where human life is involved, it is our rule, *in favorem vitæ,* to examine the whole case to see that no error appears on the face of the record. *S. v. Clyburn, post,* 618; *S. v. Thomas, ante,* 458; *S. v. Taylor,* 194 N. C., 738; *S. v. Ross,* 193 N. C., 25, 136 S. E., 193; *S. v. Ward,* 180 N. C., 693, 104 S. E., 531.

The prisoner is now asking that a new trial be awarded on account of the matters and things set out in the memorandum aforementioned and, of course, he could not hereafter plead former jeopardy, should his request be granted. *S. v. Rhodes,* 112 N. C., 857, 17 S. E., 164. I do not think the question is exclusively one of *coram non judice* or loss of jurisdiction on the part of the trial court—such might be the proper inquiry on application for writ of *habeas corpus*—but on appeal to this Court, having, as it does, appellate jurisdiction and "general supervision and control over the proceedings of the inferior courts" (Const., Art. IV, sec. 8), the question is one of due process of law. It is fundamental with us and expressly vouchsafed in the bill of rights that no man shall be "deprived of his life, liberty or property, but by the law of the land." Const., Art. I, sec. 17. The death penalty can be inflicted only as the law in its due administration commands. The concurring opinion of *Associate Justice Brogden,* filed herein, fully covers the law on this subject, as I understand it, and in this regard I entertain views similar to those expressed by him.

ADAMS, J., concurring: Four members of the Court agree in saying that a new trial should be granted for misdirection of the jury. Under these circumstances the assignment of error noted in the record as an exception which was not taken at the trial would probably not be adverted to if it were not for the gravity of the offense related in the memorandum; but since the prisoner has urged this incident as setting forth an invasion of his rights by the alleged abrogation of a law "which hears before it condemns, which proceeds on inquiry, and renders judgment only after trial," it has been thought not inexpedient to give expression to the divergence of opinion not unreasonably produced by this deplorable occurrence.

It may be said first of all that the conduct of the bystanders who perpetrated or encouraged the assault upon the prisoner was utterly indefensible. The Superior Court was in session; the judge was on the bench; the prisoner was on trial in the orderly course of criminal procedure; there was no reason to apprehend a miscarriage of justice. As the evidence was developed friends of the dead child made the first move, no doubt under the natural impulse of uncontrolled passion; but even their violent and overwhelming revulsion of feeling cannot justify or condone the attempt to seize the prisoner and summarily to drag him from the presence of the court.

The crime for which the prisoner was prosecuted was committed 8 December, 1927. A few days afterwards he was put on trial for murder; he was represented by attorneys appointed by the court and was given every opportunity to prepare his defense. During the trial he was

assaulted. He had previously made no motion for a continuance, and after the assault he made no motion for a mistrial, and took no exception to anything that was done or said in reference to the disturbance. Even after the verdict was returned he moved neither to set it aside nor to grant a new trial. The case on appeal was settled about two weeks after the term had expired, and the judge of his own volition, and not at the instance of the prisoner, then set out in the record a statement of facts relating to the assault. After this memorandum was made a part of the record the prisoner for the first time made the point that the judge had committed error in not ordering a mistrial of his own motion after the demonstration in the courtroom had taken place.

It will be seen, then, that the initial and fundamental question is this: After his conviction for murder in the first degree, is the prisoner entitled as a legal or constitutional right to a new trial on the ground that the presiding judge did not, of his own motion, order a mistrial on account of the assault and demonstration of bystanders in the court-room, when the prisoner did not, either during the trial or at any other time, move the court to order a mistrial, or to set aside the verdict, or to grant a new trial, and did not except to anything growing out of the disorder or assign any reason for his failure to make such motions or to take such exceptions?

In considering this question we must not permit ourselves to be borne away by a wave of indignation or influenced by "one pulse of passion," for "What Reason weaves, by Passion is undone." In the light of recognized principles let us consider the undisputed facts. The memorandum is set out in another opinion and need not be repeated here. We may be able to avoid some "chaos of thought" by keeping in mind this statement of the trial judge: "This memorandum is made by the court of its own motion for the information of the Supreme Court, as no exception was taken by the prisoner at the time." This ought to be final. Neither the judge nor the prisoner nor the State treated the exception as entered at any time during the trial. One of the strong points in the argument of the Assistant Attorney-General was the fact that no motion was made in the court below, the denial of which would constitute grounds for alleged error. If this Court, without consent of the prosecution, under the guise of "administering justice" should insert into the record a so-called exception which first occurred to the prisoner's counsel several days after the trial court had adjourned, it would burden the practice with an innovation which, I submit, has no support in precedent or principle. It would introduce the thralldom of an uncertain and variable appellate discretion which would serve as a treacherous and intolerable substitute for the administration of established law.

After a reasonably painstaking investigation I have found no authority, and none has been cited or brought to my attention, which convinces me that this question should be answered in the affirmative. The controlling principle, as I understand it, is this: As the prisoner did not except during the trial, and has not assigned a reason for his failure to do so, the disorder in the courtroom would not entitle him to a new trial as a constitutional right unless in effect it wrought a dissolution of the court or a loss of jurisdiction so as to make the trial a nullity and the proceedings *coram non judice. Frank v. Mangum,* 237 U. S., 309, 59 Law Ed., 969. The record discloses neither of these conditions; and a departure from this settled principle would tend to engraft upon our jurisprudence a practice which would be charged with the possibility of the gravest results.

The case of *Moore v. Dempsey,* 261 U. S., 86, 67 Law Ed., 543, sets forth conditions under which the principle just referred to may be applied. In that case five negroes who had been convicted of murder in the first degree were sentenced to death. Omitting more than a bare reference to the circumstances under which the homicide was committed, the arrest by the mob of the defendant's counsel and his hasty departure to save his life, I quote the salient facts as given in the opinion: "Shortly after the arrest of the petitioners a mob marched to the jail for the purpose of lynching them, but were prevented by the presence of United States troops and the promise of some of the Committee of Seven and other leading officials that, if the mob would refrain, as the petition puts it, they would execute those found guilty in the form of law. The committee's own statement was that the reason that the people refrained from mob violence was 'that this committee gave our citizens their solemn promise that the law would be carried out.' According to affidavits of two white men and the colored witnesses on whose testimony the petitioners were convicted, produced by the petitioners since the last decision of the Supreme Court, hereafter mentioned, the committee made good their promise by calling colored witnesses and having them whipped and tortured until they would say what was wanted, among them being the two relied on to prove the petitioners' guilt. However this may be, a grand jury of white men was organized on 27 October, with one of the Committee of Seven and, it is alleged, with many of a posse organized to fight the blacks, upon it, and, on the morning of the 29th the indictment was returned. On 3 November the petitioners were brought into court, informed that a certain lawyer was appointed their counsel, and were placed on trial before a white jury— blacks being systematically excluded from both grand and petit juries. The court and neighborhood were thronged with an adverse crowd that threatened the most dangerous consequences to any one interfering with

the desired result. The counsel did not venture to demand delay or a change of venue, to challenge a juryman, or to ask for separate trials. He had had no preliminary consultation with the accused, called no witnesses for the defense, although they could have been produced, and did not put the defendants on the stand. The trial lasted about three-quarters of an hour, and in less than five minutes the jury brought in a verdict of guilty of murder in the first degree. According to the allegations and affidavits there never was a chance for the petitioners to be acquitted; no juryman could have voted for an acquittal and continued to live in Phillips County, and if any prisoner, by any chance, had been acquitted by a jury, he could not have escaped the mob."

These facts give the background of a pretended trial which was indeed a "mask," and "empty form," a travesty, a sheer mockery of justice. The circumstances as recited reveal a manifest subversion of justice because the prisoners were deprived of their defense and hurried to conviction under the pressure of a mob, the lives of the jurymen were endangered if, by any chance the prisoners should be acquitted, and to this pressure the judge himself yielded. Hence said the Court: "If the case is that the whole proceeding is a mask—that counsel, jury, and judge were swept to the fatal end by an irresistible wave of public passion, and that the State courts failed to correct the wrong—neither perfection in the machinery for correction nor the possibility that the trial court and counsel saw no other way of avoiding the immediate outbreak of the mob can prevent this Court from securing to the petitioners their constitutional rights."

In the case before us neither jury, nor counsel, nor judge was swept to the fatal end by anything approaching an irresistible wave of public passion. It would be extravagant and fanciful to say that the judge abdicated, or surrendered, or succumbed. The prisoner's counsel do not pretend that by fear, or intimidation, or, indeed, by any other means they were prevented from making any motion or entering any exception deemed necessary to the enforcement of the prisoner's rights; and certainly, if the judge's finding of the facts is not to be disregarded the jury was neither terrorized nor coerced into a verdict of guilty. The record is that during the demonstration the jury sat in perfect order and did not appear to be at all disturbed. The disorder was promptly suppressed; six or seven members of a military company came into the courtroom and formed a cordon around the prisoner; and the trial then proceeded in an orderly manner. There was no other disorder or demonstration of violence. In his charge the judge warned the jury in emphatic words not to be influenced by what had occurred; and granting that the effect on their minds cannot be definitely determined, it is not unreasonable to conclude, as the Court said in *Harrison's case*, that the

impressive conduct of the judge had far more influence upon the minds of the jury than the impulsive conduct of some of the audience. *S. v. Harrison,* 145 N. C., 408. However this may have been, there was no such dissolution of the court, or surrender of its jurisdiction, or subversion of justice as made it necessary to set aside its subsequent proceedings, or such as reduced them to a nullity. If this conclusion is correct it follows that the judge was not as a matter of law required, of his own motion, to withdraw a juror and order a mistrial. If he had done so in the absence of a motion or an exception by the prisoner the defense of former jeopardy would no doubt have been interposed on the second trial. *S. v. Jefferson,* 66 N. C., 309.

If the jurisdiction of the Superior Court was not lost in the course of the proceedings and the prisoner was not prevented from asserting his rights he cannot be heard to say for the first time, after the case on appeal was settled that the judge should voluntarily have entered exceptions or made orders which had not been requested. Not one of our decisions sustains the prisoner's contention. As said in *S. v. Harrison, supra,* it is but fair to the judge and essential to the administration of justice that the prisoner, unless prevented by menace or fear, should in apt time make his objections known. In *S. v. Wilcox,* 131 N. C., 707, the facts were that for the purpose of breaking the force of counsel's argument a disorderly crowd entered upon a series of demonstrations within and without the courtroom which were of such proportions as to warrant a new trial. No motion was made in the lower court to set aside the verdict, the assigned reason being that the prisoner would at once have met a violent death. In effect this circumstance was regarded as tantamount to an exception taken at the time, for, on appeal to this Court, the Attorney-General agreed to consider the motion as having been entered at the proper time in the court below; and upon this theory the decision was made to rest. It is not necessary to consider a long line of cases in which new trials were granted for misconduct of counsel, jury, witness, or judge upon exceptions noted during the course of the trial.

As no case has been cited from our reports which upholds the prisoner's contention, let us look elsewhere. I refer to the well known case of *Frank v. State* (80 S. E., 1016), in which a new trial was urged on the ground of mob domination and denied, and to the motions for a new trial (83 S. E., 233), and for setting aside the verdict (*ibid.,* 645), merely to observe that the proceedings were shot through with objections taken during the trial. In *Collier v. State,* 42 S. E., 226, the plaintiff in error was on trial for rape, and while the prosecutrix was testifying her husband assaulted or attempted to assault the defendant. An excited crowd in the courthouse moved toward the defendant as if determined to

take him away. A new trial was granted, but on the ground that after the disturbance had subsided, and while the trial was in progress the defendant moved the court to declare a mistrial on account of the demonstration, and refusal to grant the motion was assigned as error. So it was in *Vaughan v. State,* 20 S. W., 588; an affidavit that the jury had been improperly influenced was considered by the trial judge in an application for a new trial. In the opinion it is said: "Affidavits are admissible for that purpose, and when considered by the trial court and brought up on the record by bill of exceptions, questions presented by them are brought before us on appeal." For misconduct of "a large crowd of persons in the courtroom" a new trial was given in *Manning v. State,* 39 S. W., 118; but there, also, the appellant's counsel asked for a bill of exceptions to the court's refusal to suppress the demonstration. *Fountain v. State,* 107 At., 554, presents a case of attempted domination by a mob, but the questions reviewed arose upon the refusal of the trial court to grant the defendant's application for a stay of proceedings. In *S. v. Weldon,* 74 S. E., 43, it was made to appear that the prisoner's counsel while going to the courthouse through a dense crowd "heard expressions in regard to lynching," which convinced him that, if he should ask for the three days of preparation allowed by law, the prisoner would be lynched, and under the compulsion of this fear he gave up that most vital right and went into trial without knowledge of the defense. For this reason no error was assigned on the trial, but the record was referred back to the circuit judge for a report of the facts. 71 S. E., 73. The report was made and the appellate court then said: "After much consideration there seems to be no escape from the conclusion that this court cannot now consider the grounds for a new trial set out in the exceptions and affidavits, for the reason that it does not appear that they have ever been passed upon by the circuit court." Owing to the gravity of the crime the appeal was dismissed without prejudice to any right of the defendants to move before the circuit court for a new trial. 71 S. E., 831. After a new trial had been denied by the lower court the appellate court upon exceptions duly presented awarded a new trial. 74 S. E., 43. The decision in substance adheres to the principle stated in *S. v. Wilcox, supra.* And so in other cases an extended review of which under the circumstances is obviously infeasible.

If, as was said in *Frank v. Mangum, supra,* a trial is in fact dominated by a mob which intimidates a jury and coerces a judge into submission so that his control of the trial is lost and there is an actual interference with the course of justice; or as was said in *Moore v. Dempsey, supra,* if judge, jury and counsel are "swept to the fatal end," there is such a want of due process of law as entitles the prejudiced party to a new trial, although no exception was taken during the course of the proceedings.

If jurisdiction is not lost, if the disorder is suppressed by the prompt and vigorous action of the presiding judge, and the trial thereafter proceeds to the end in the usual orderly way, and the complaining party expresses no objection, makes no motion, enters no exception, and fails to assign a reason for not doing so, he is not entitled to have the verdict and judgment set aside as a constitutional right by a method which has aptly been styled "a *post mortem* attempt to get another trial." If, in either case, an exception is taken on the trial, it is the duty of the appellate court to consider it when it is duly set out in the case on appeal as an assignment of error. If an exception is not taken and a satisfactory reason is given for the omission the procedure would probably be similar to that in *S. v. Wilcox, supra,* or *S. v. Weldon, supra.* Whether the circumstances recited in the memorandum would have assured the prisoner a new trial if exception had been taken at the proper time and incorporated in the record is not presented for decision.

There is another phase of the question: It is contended that a new trial may be granted by virtue of Art. IV, sec. 8, of the Constitution. The entire section is as follows: "The Supreme Court shall have jurisdiction to review, upon appeal, any decision of the courts below, upon any matter of law or legal inference. And the jurisdiction of said court over 'issues of fact' and 'questions of fact' shall be the same exercised by it before the adoption of the Constitution of one thousand eight hundred and sixty-eight, and the Court shall have the power to issue any remedial writs necessary to give it a general supervision and control over the proceedings of the inferior courts."

It will be noted that the first part of the section confers jurisdiction to review decisions upon appeal; but upon the point raised by the prisoner no decision was made. The last clause confers power to issue any remedial writs necessary to give the Court a general supervision and control over the proceedings of the inferior courts. These remedial writs, such as *certiorari* and *supersedeas, mandamus,* the writ of prohibition, and the old writ of error until superseded by the statutory appeal, are usually issued when there is some defect in the record or when some right has apparently been lost which the appellant is entitled to have enforced or when some wrong has been done which ought to be redressed. But here, as I see it, the decisive fact is that no remedial writ has been issued or applied for, and in consequence there is no basis for the "general supervision and control" for which the last clause provides. A close examination of our own decisions will, in my opinion, lend to this conclusion. The appeal presents a bare question of law, to the consideration of which our office as a revising and appellate court is restricted. *McMillan v. Baker,* 85 N. C., 292. Unless one of the remedial writs is issued "this Court best serves its purpose and discharges its legitimate

function in our governmental system when it confines itself to its constitutional orbit 'to review any decisions of the courts upon any matters of law or legal inference.'" *Barker v. R. R.,* 137 N. C., 214.

We cannot be too pronounced in the declaration that it is "better to rule than be ruled by the rout"; that the law of the mob shall not supplant the law of the land; and, as suggested in the dissenting opinion in *Frank v. Mangum, supra,* that "lynch law is as little valid when practiced by a regularly drawn jury as when administered by one elected by a mob intent on death." But in our solicitude to suppress the mob we must guard against undermining the foundation of principles which constitute the very structure of the law. I concur in the two propositions maintained by *Connor, J.,* that the prisoner is entitled to a new trial for inadvertence in the charge, but not for the disorder which occurred during the trial.

BROGDEN, J., concurring in result: The carefully prepared opinion of the Court, as I interpret the decisions, is correct with respect to the instruction complained of, but in my judgment there is a far graver and more serious aspect of the case which involves not only the constitutional rights of the defendant, but also the more important consideration of the integrity and sanctity of trial courts and their capacity to enforce and apply the law within their own tribunals. The paramount question presented by the record is what constitutes a fair trial as contemplated by law? This question is raised by a memorandum of the trial judge attached to the case on appeal. It is suggested that we have no right to consider this memorandum by virtue of the fact that no exception was taken at the trial to the outbreak in the courtroom. But the memorandum is here. The able and conscientious trial judge evidently thought it ought to be here, and therefore incorporated it as a part of the case on appeal. Assistant Attorney-General Nash, realizing the grave importance of the question involved, has made no motion to strike it from the record. Indeed, approximately one-half of his brief deals with the question. Both parties, therefore, have treated it as an exception. The defendant appealed from the judgment and this in itself is an exception thereto. If the judgment is not supported by a lawful trial, it is void as a matter of law and this Court was created for the express purpose of reviewing matters of law and legal inference. To say that a court of last resort cannot consider a matter of grave public moment, vitally affecting the administration of justice everywhere in the State, because no formal exception was put in the record by a mob-ridden prisoner, when the trial judge and all parties have treated it as such, is to exalt the shadow and debase the substance. This argument seeking to avoid the result of the intolerable tyranny of force takes refuge behind the

equally intolerable tyranny of form. Both are repugnant to the genius of a free and justice-loving people. While of course a trial ought not to be weighed in golden scales, yet if the law of the land and the integrity of courts are too insignificant to register, then the law has no use for scales, golden or otherwise.

The memorandum referred to shows the following: "While Deputy Sheriff Kornegay was on the witness stand, and while the courtroom was crowded to its full capacity, the father of the deceased girl, and her uncle, William Tedder, approached the prisoner, and before anyone was aware of his intentions, seized the prisoner by the collar of his coat and attempted to drag him from the bar and into the main body of the courtroom, toward the front door. A number of persons in the audience shouted 'take him, take him!' and a part of the crowd attempted to assist the two Tedders; but the greater part of the audience either remained standing or attempted to get out of the doors. Sheriff Grant rushed into the crowd, seized the prisoner, wrested him away from William Tedder and took him into the jury room, immediately to the rear of the witness stand. He left the prisoner in the jury room with a deputy, returned to the courtroom, and, as the audience was in somewhat of a turmoil, fired his pistol at the ceiling in order to quell the tumult. The court ordered the sheriff and his deputies to stand by and prevent any further demonstration, and stated to the audience that any further attempt upon the life of the prisoner would be met by force. The local military company had been directed by the Adjutant General to hold itself in readiness in case of an emergency, and it had been agreed that the company should assemble in the armory and be in full uniform by 9:30 o'clock on Sunday morning when the court assembled to continue the trial. The signal for help was to ring the courthouse bell, which was done; and in a few minutes soldiers came into the courtroom, some six or seven of them, and formed a cordon about the prisoner during the remainder of the trial. There was no further demonstration and the trial proceeded in an orderly manner. During the foregoing demonstration the jury sat in perfect order and did not appear to be at all disturbed; and the court charged them, as appears from the case, not to be influenced by what had occurred. This memorandum is made by the court of its own motion, for the information of the Supreme Court, as no exception was taken by the prisoner at the time. The foregoing is settled as case on appeal in the case of State v. Larry Newsome, counsel having disagreed. This 2 January, 1928."

In *Robinson v. State*, 65 S. E., 792, the Georgia Court defined a fair trial as follows: "A fair trial means one in which there shall be no bias or prejudice for or against the accused, and in which not only the witness chair and the jury box, but the courthouse also shall be purged of

every suspicious circumstance tending to take from the accused any of the rights given to him by the law." Again in the famous *Frank case,* 237 U. S., 309, 59 L. Ed., 983, the Supreme Court of the United States said: "We, of course, agree that if a trial is in fact dominated by a mob, so that the jury is intimidated and the trial judge yields, and so that there is an actual interference with the course of justice, there is, in that court a departure from due process of law in the proper sense of that term." To the same effect is *Massey v. State,* 20 S. W., p. 762. The Texas Court said: "In all civilized countries the law has always shown the most sacred regard for human life, and judicial tribunals, in the administration of the criminal law, have always deemed it proper to adhere with great strictness to established rules, where life and liberty are concerned. If courts could feel themselves at liberty to depart from principle or established rules in order to hasten the punishment of even great offenders, such departures might result in the destruction of those safeguards which, in accordance with the genius of all free governments, have been provided for the life and liberty of men."

Upon the record and upon the principles of law applicable, the complete question before us is: "Can a prisoner, charged with a capital felony, and while testimony is being offered against him in open court, be assaulted, man-handled and dragged about the courtroom in the presence of the jury, and yet secure such a fair trial as under the Constitution and laws of the State will support a judgment condemning him to death?"

At the outset of the discussion it is perhaps advisable to consider the trend of judicial thought upon this question. In this State certain aspects of the question involved have been discussed in *S. v. Wilcox,* 131 N. C., 707; *S. v. Harrison,* 145 N. C., 408; *S. v. Vann,* 162 N. C., 534; *S. v. Caldwell,* 181 N. C., 519. In the *Caldwell case* a mob in Wayne County attacked the courthouse and jail at night and after the adjournment of ·court, presumably in an effort to lynch the prisoners. The attack was repelled. The jury was at a hotel two blocks away, and there is nothing in the case, as reported, to indicate that the jury knew of the attack. The next morning the trial proceeded regularly and in proper order.

Upon such a state of facts the verdict was upheld.

In *S. v. Vann* a ripple of laughter passed over the courtroom and there was some slight applause consisting of one or two handclaps by ladies, over a tilt between .the solicitor and counsel for the defendant. The court promptly repressed the disturbance and the judgment was upheld. In *S. v. Harrison* there was applause in the courtroom evoked by a tilt between counsel. The court imprisoned one offender for his unseemly conduct, and this Court observed upon the appeal that "summary punish-

37—195

STATE *v.* NEWSOME.

ment upon an offender had far more influence upon the minds of the jury than the impulsive conduct of some of the audience." In *S. v. Wilcox,* while counsel for the defendant was addressing the jury, about one hundred people, as if by concert, left the courtroom. Soon thereafter a fire alarm was given near the courthouse, which caused a number of other persons to leave the courtroom. As in the case at bar, there was no motion made by the prisoner to set aside the verdict in consequence of such conduct, and the court did not find that the jury was influenced thereby. This Court observed: "In such a case as this, it was not indispensable that a finding by his Honor that the jury had been influenced by the conduct of the offenders should have been made." In discussing the merits of the case the Court said: "The disorderly proceedings assumed such proportions as to warrant this Court in declaring that the trial was not conducted according to the law of the land. The propriety of our ruling is strengthened by the circumstances that contempt proceedings were not commenced against those offending, and that no motion was made to set the verdict aside and for a new trial after such unheard of demonstration. . . . The prisoner must not only be tried according to the forms of law, these forms being included in the expression 'the law of the land,' but his trial must be unattended by such influences and such demonstrations of lawlessness and intimidation as were present on the former occasion. The courts must stand for civilization, for the proper administration of the law in orderly proceedings. There must be a new trial of this case." *Clark, J.,* concurring in the opinion of the Court said: "The administration of justice must not only be fair and unbiased, but it must be above any just suspicion of any influence, save that credit which the jury shall give to the evidence before them. It is of vital importance to the public welfare that the decisions of courts of justice shall command respect, but this will be impossible if there is ground to believe that extraneous influence of any kind whatever has been brought to bear."

The wholesome and salutary principles announced in the *Wilcox case* have been recognized with practical uniformity by Appellate Courts of other jurisdictions. In *Sanders v. The State,* 85 Ind., 318, the defendant was charged with killing his wife. The killing had aroused intense feeling, and when the case came to trial threats of lynching were made by a mob. Counsel for the prisoner prepared an affidavit for continuance, but feared to present it lest the mob would seize and hang his client. The prisoner first entered a plea of not guilty, but by reason of the presence of the mob, the plea was withdrawn and a plea of guilty entered. A verdict of guilty was returned by the jury. The defendant was sentenced to life imprisonment and was immediately hurried to the penitentiary. Thereafter the defendant asked that the plea of guilty be

vacated and that he be awarded a trial according to law. The Court vacated the judgment and permitted the defendant to withdraw the plea of guilty. The Court said: "All men are by our laws entitled to a fair trial, in absolute freedom from restraint and entire liberty from fear of threats and violence." In *Collier v. State,* 42 S. E., 226, the defendant was tried and convicted for rape. While the prosecutrix was upon the witness stand she grew excited and turned to the defendant, saying, "You know you are guilty." Thereupon a large portion of the audience became very much excited and came pouring over the benches in an excited manner to where the defendant was. The judge commanded the crowd to sit down. After the jury had retired to the jury room to consider their verdict there was a crowd of fifty or seventy-five people in and around the courthouse and in the yard of the courthouse who were acting in a very boisterous manner. The Supreme Court of Georgia said: "It would be mere idle talk to say that the jurors did not understand that the demonstration was against the prisoner on trial. It is true that each of the jurors testified that, while they heard the noises, they could not understand what was said. . . . But the question is not whether, in fact, the jurors were influenced by these demonstrations, but were the demonstrations calculated to influence the jurors in their action. . . . Tested by this rule, it is apparent that the defendant did not have a fair and impartial trial, which the law guarantees to him, and to which he is entitled be he guilty or innocent. The heinousness of the crime with which he was charged must not and cannot be allowed to affect the manner of his trial; and only by a fair and legal trial can his guilt be so established as to make him subject to the punishment which the law visits on offenders in such a case." So in *Woolfolk v. State,* 8 S. E., 724, during the progress of the trial, someone in the audience cried out, "Hang him! Hang him!" All the jurors made affidavits that these things had no influence upon their minds. The Supreme Court of Georgia said: "Can any of us know how far our minds are influenced by applause or excitement of a crowd which surrounds us? Can any of us say, even in this Court, that this or that piece of testimony, or this or that argument of counsel, has not influenced our minds? Can any of us say that, on the trial of one of the most heinous crimes ever committed in this State or any other, the applause of the crowd, the fierce cries of 'Hang him! Hang him!' from members of the crowd, followed later on by a repetition of the same cry, would have no influence upon our minds? Our minds are so constituted that it is impossible to say what impression scenes of this kind would make upon us, unless we had determined beforehand that the prisoner was guilty or innocent." Again in *S. v. Weldon,* 91 S. C., 29, 74 S. E., 43, the second head-note is as follows: "Where a large crowd of people intensely hostile to the accused crowded

the courthouse during their trial for murder, and filled the space within the bar immediately around the judge, the jury, and the witnesses, so that counsel for accused did not see the jury, until he addressed them, because of the crowd, and the crowd's intrusion into that part of the courtroom was calculated to overawe the jury, and it was not so safe-guarded against extraneous influences as to allow the defendants the right of trial by an impartial jury. . . : . The defendants, upon con-viction, were entitled to a new trial." In that case the trial judge, in making report of the trial to the Appellate Court stated: "It was simply a crowd and quite a crowd for Florence courtroom, and that is all that can be said about it, except that it was the best behaved crowd I ever saw." The Supreme Court of South Carolina, however, notwithstanding, said: "We are unable to assent to the opinion of the presiding judge that such a state of affairs did not interfere with the orderly conduct of the business of the Court or with the rights of the accused. . . . By our Constitution, the people have set the law above themselves, ex-cept as they choose to change it by the methods which they themselves have ordained; and they have laid upon the courts the duty of enforcing their promise that the weak, as well as the strong, shall be condemned only after a fair trial according to law before an impartial jury. In the faithful performance of their promise by the people, and in the dis-charge of their duty by the courts, is involved, not only the public honor, but public safety, prosperity, and happiness; for in the long run neither individual nor community success is possible, unless men feel that they will not lose life nor liberty nor property without a fair and impartial trial under the law of the land."

In *Fountain v. State,* 107 Atlantic, 554, 5 A. L. R., 908, it appeared that when court adjourned at ten o'clock at night on the first day of the trial a large crowd of about two thousand persons were assembled on the courthouse ground upon which the county jail was located; that while the prisoner was being taken from the courthouse to the jail through the crowd personal violence was inflicted upon him in an effort to take him from the custody of officers and lynch him. In the confusion the defendant made his escape. The trial was suspended and a reward of $5,000 for his recapture was offered by the court. Within two days he was recaptured and the trial proceeded, and the defendant was con-victed of rape. The Supreme Court of Maryland said: "It is natural that popular wrath and indignation should be aroused by such an atrocious offense as this record discloses. But the identification and punishment of the criminal must be left to the careful and regular proc-esses of the law, however deep and just may be the public sense of horror at the crime. The law does not tolerate any interference with the right of the humblest individual to be accorded equal and exact justice,

and, when charged with crime, to have the question of his guilt or innocence fairly and impartially determined. It is of the highest concern to the people and courts alike that this vital and sacred right shall be preserved inviolate. Judgment reversed, and new trial awarded." The Court of Criminal Appeals of Texas, considering the question in *Massey v. State,* 20 S. W., 758, said: "Appellant has not had a fair and impartial trial. He has not had a legal trial. But it may be urged that he is guilty, beyond all question, and therefore the judgment should be affirmed. Not so. The accused must be tried and convicted legally, and though he be a negro, he must be tried in precisely the same manner as if he were a white man. In the case of *Shylock v. Antonio,* the merchant of Venice, Bassanio, a great friend of Antonio, urged Portia, the judge, to "wrest once the law to your authority. To do a great right, do a little wrong, and curb this cruel devil of his will." Portia's answer was law—the correct principle. She replied: "It must not be. There is no power in Venice can alter a decree established. 'Twill be recorded for a precedent, and many an error, by the same example, will rush into the State. It cannot be."

In *Faulkner v. State,* 189 S. W., 1077, the defendant was indicted and convicted of rape. When the prosecutrix was testifying she pointed out the defendant. Immediately a brother of the prosecutrix who was sitting near the bar, arose with the exclamation "Lynch the son of a bitch, he is mine," and came walking toward the defendant. A deputy sheriff took him before he got to the defendant. The sheriff partly drew his pistol, commanding the brother of the prosecutrix to stop, and he was taken from the courtroom. The presiding judge said nothing and the offending party was neither fined nor otherwise reprimanded for his conduct. While the jury was deliberating there was a large crowd in the courtroom. The judge ascertained that the verdict of the jury would be life imprisonment and was afraid to bring the jury out of the jury room until the crowd dispersed, which was sometime after midnight. The court of criminal appeals of Texas awarded a new trial, the court observing: "It will be an unfortunate day in Texas and its jurisprudence and to the life-loving citizenship, if mob spirit can pervade the courtroom and influence the jury in their verdict against the testimony, or even where there might be testimony sufficient to support the conviction, that would influence or tend to influence the jury against defendant on such trial."

The cases referred to are typical of a great multitude of decisions upon various aspects of the subject. The writer has found no case in which a prisoner has actually been assaulted by a mob in the presence of the jury and during the progress of taking testimony. The case at bar therefore is without a parallel or a peer in the judicial history of the question

involved so far as I have discovered. Indeed this Court has held that unnecessary abuse of a defendant in the argument of his case may warrant a new trial. The famous "upas tree case" is a shining example. The incident occurred in the case of *Coble v. Coble,* 79 N. C., 589, in which the attorney for the plaintiff compared the defendant to "the upas tree, shedding pestilence and corruption all around him." The contention was that this language could not have influenced the jury. This Court said: "This is the excuse. To use it seems an aggravation of the offense, for it admits that there was not and could not have been a single ground for the derogatory assault upon the defendant. It was therefore unprovoked and wanton, and could have been resorted to for the single purpose only of prejudicing his cause before the jury—the verdict must be carried by denouncing the man—and it was carried." Again in *S. v. Tucker,* 190 N. C., 708, the prisoners were referred to as follows: "Gentlemen of the jury, look at the defendants, they look like professional bootleggers, their looks are enough to convict them." The Court awarded a new trial, although the defendants were charged not with a capital felony, but for a violation of the prohibition law. Certainly, if a new trial is awarded under the law for an assault with words in the trial of a misdemeanor, it would appear that the actual assaulting and manhandling of a prisoner in the presence of a jury during the progress of his trial for a capital felony would be of equal dignity with a violation of the liquor law or of a civil action when perhaps an insignificant amount of property was involved.

I am not inadvertent to the fact that such a crime as is disclosed by the present record excites in a normal man a feeling of outrage as strong as death and as cruel as the grave; but society from motives of sheer preservation has built the rock of law to stand as an unshaken and everlasting barrier to roll back, in vain, the lashing waves of popular clamor and revenge. Under the law as written the life of the defendant can be taken by the State, if found guilty after a fair and impartial trial, but when the State takes life it ought to take it as befits the peace and dignity of a great State, and this can only be done when the constitutional safeguards set by our fathers have been observed and applied in the trial of the accused. These safeguards are not designed solely for the benefit of a criminal, but for the preservation and integrity of society itself. Much is being said and written about law enforcement. But if the law cannot be enforced within the very tribunals of justice, so as to preserve inviolate the person of litigants from frenzied force, and yet uphold verdicts rendered after such unlawful invasion of the sanctity of judicial proceedings, well may the court criers throughout the State in opening and adjourning the sittings, shout in thunder tones, "God save the State and this Honorable Court."

I think, when the defendant was seized, assaulted, man-handled and dragged about the courtroom, in the presence of the jury and during the introduction of testimony against him, that then and there the trial ended and the subsequent proceedings were a nullity.

CLARKSON, J., dissenting: The administration of the criminal law is a serious undertaking; it involves the wellbeing of society. The greatest and the humblest are entitled to a fair and impartial trial. The law intends that the guilty be punished and that technicalities and refinements should not defeat justice. A trial should be on its merits.

The Constitution of North Carolina on this subject is as follows: Article I, sec. 11. "In all criminal prosecutions every man has the right to be informed of the accusation against him and to confront the accusers and witnesses with other testimony, and to have counsel for his defense, and not be compelled to give evidence against himself or to pay costs, jail fees, or necessary witness fees of the defense, unless found guilty."

Section 12. "No person shall be put to answer any criminal charge, except as hereinafter allowed, but by indictment, presentment or impeachment."

Section 13. "No person shall be convicted of any crime but by the unanimous verdict of a jury of good and lawful men in open court. The Legislature may, however, provide other means of trial for petty misdemeanors, with the right of appeal."

In the humanity of the law it is written that the "jury of good and lawful men" cannot convict one charged with crime unless the culprit has been proven guilty of the offense charged beyond a reasonable doubt. There is no place in orderly government for mob violence. The danger of punishing the innocent is too well known—the leading case is Pilate yielding to the mob. It is a matter of common knowledge, and to the everlasting credit of this commonwealth, that the strong arms of the executives for the last seven years have reached out and protected every one, no matter how humble and how revolting and heinous was the alleged crime, and has seen to it that the law was administered through the courts. During that time not a single lynching has taken place. There has been no super-government in this commonwealth, so courts should be slow to grant new trials on technical grounds with no merit and where no injustice has been done.

The present record, as I construe it, discloses that on the trial of defendant every legal right given to him by the Constitution was complied with. This Court, under Article IV, sec. 8, has "no jurisdiction to review, upon appeal, any decision of the courts below," except "upon any matter of law or legal inference." The power "to issue any remedial

writs necessary to give it a general supervision and control over the proceedings of the inferior courts" does not apply to a case like the present one.

As to what occurred in the courtroom during the progress of the trial, no exception or assignment of error was made by defendant. Nor did defendant during the progress of the trial request a mistrial for what took place and for failure to except and assign error. Nor did defendant at the conclusion ask that the verdict be set aside or for a new trial. The defendant is not now entitled in this Court to be heard that he is prejudiced by the occurrence. Granting that it was unseemly and out of the ordinary, defendant did not except and assign error, but allowed the trial to proceed. The court below charged the jury pointedly that what had occurred in the courtroom should or ought not to influence them in the slightest degree, and they should be governed only by the evidence of the witnesses on the stand unbiased by anything that had occurred or anything they had observed. The presumption is that the jury was composed of men "of good moral character and of sufficient intelligence." Their duty was to render a verdict upon the evidence. This Court cannot *ex mero motu* step in and grant a new trial after the charge of the court on the aspect of the occurrence for that which defendant himself did at the time except to and assign error as prejudicial. The Constitution, as I construe it, gives this Court no such supervisory power over the Superior Court—a court created and vested by the Constitution with power alone to try cases like the present.

I will now confine myself to the only material exception and assignment of error as to the charge of the court below, upon which a majority of this Court grants a new trial.

The court below charged the jury as follows: *"In this case I do not see and cannot arrive at any conclusion that would lead me to leave with you the question of his guilt upon a charge of second degree murder or manslaughter; I therefore charge you that you can return but one of two verdicts in this case, either murder in the first degree or not guilty."*

I cannot construe the evidence in any other light than the careful and learned judge who tried the action in the court below did; that there was no evidence of murder in the second degree or manslaughter. It has always been recognized in this jurisdiction that this Court in its discretion can say what evidence is sufficient—more than a scintilla— in civil or criminal actions to be submitted to the jury. Out of this well-settled principle the procedure in civil actions is regulated by C. S., 567, known as the *Hinsdale Act,* in criminal actions, C. S., 4643, known as the *Mason Act,* spoken of as demurrer to the evidence. This power or discretion in the Superior and Supreme Appellate Court, should be exercised with care and caution. Recently the majority of this Court,

after a most careful consideration, said in *S. v. Montague, ante,* p. 20, that the circumstantial evidence in that case was not sufficient to have been submitted to a jury. Whether there be any evidence is a question for the judge; whether sufficient evidence for the jury. *Wittkowsky v. Wasson,* 71 N. C., 457; *Ridge v. R. R.,* 167 N. C., pp. 510-517.

The principle being established, what is the law? C. S., 4200, is as follows: "A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture *or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any* arson, rape, robbery, burglary or other felony, *shall be deemed to be murder in the first degree and shall be punished with death.* All other kinds of murder shall be deemed murder in the second degree, and shall be punished with imprisonment of not less than two nor more than thirty years in the State prison." (Italics mine.)

C. S., 564, is, as follows: "No judge, in giving a charge to the petit jury, either in a civil or a criminal action, *shall give an opinion whether a fact is fully or sufficiently proven,* that being the true office and province of the jury; but he shall state in a plain and correct manner the evidence given in the case and declare and explain the law arising thereon." (Italics mine.)

Under C. S., 564, *supra,* it is well settled for nearly a century and a third that where there is sufficient evidence to be submitted to the jury, that a judge cannot express an opinion whether a fact is fully or sufficiently proven. This is the sole province of the jury, but whether there is or is not sufficient evidence is one solely for the court, and has been for all time exercised by the trial court and upon proper exception and assignment of error considered in this Court.

C. S., 4642, is as follows: "Nothing contained in the statute law dividing murder into degrees shall be construed to require any alteration or modification of the existing form of indictment for murder, but the jury before whom the offender is tried shall determine in their verdict whether the crime is murder in the first or second degree." This section has been construed merely to mean that when the jury renders the verdict, the degree must be stated.

In *S. v. Ross,* 193 N. C., at p. 26, construing this section, it is said: "Again, in the record, as first certified to this Court, it is stated that the jury returned the following verdict: 'That the said W. L. Ross is guilty of the felony and murder in manner and form as charged in the bill of indictment.' It was said in *S. v. Truesdale,* 125 N. C., 696, that, since the act of 1893, now C. S., 4200 and 4642, dividing murder into two degrees, first and second, a verdict which fails specifically to find the prisoner guilty of murder in the first degree, will not support a death sentence. See, also, *S. v. Murphy,* 157 N. C., 614."

In *S. v. Spivey,* 151 N. C., at p. 686, it is said: "Under the construction of the statute by this Court in *S. v. Gilchrist,* 113 N. C., 673, and *S. v. Norwood,* 115 N. C., 789, the third section (now section 3271, Revisal), (C. S., 4642), does not give jurors a discretion, when rendering their verdict, to determine of what degree of murder a prisoner is guilty. They must render a verdict according to the evidence; and, believing a prisoner guilty, beyond a reasonable doubt, of murder in the first degree, it is their duty so to find, however much inclined to show mercy by rendering a verdict of a lesser offense. Their obligation in that respect has not been changed by the statute, and it is the same that it was upon the trial for homicide before its enactment, and the question was whether the prisoner was guilty of murder or manslaughter." *S. v. Covington,* 117 N. C., 834.

In *S. v. Wiseman,* 178 N. C., at p. 795, it is said: "It is one of those cases in which there was no doubt as to the manner of the killing, and the court might well have charged the jury, though it did not do so, that 'the prisoner was guilty of murder in the first degree or nothing.' This would have been strictly in accordance with the testimony and numerous precedents. *S. v. McKinney,* 111 N. C., 684; *S. v. Cox,* 110 N. C., 503; *S. v. Byers,* 100 N. C., 512; *S. v. Jones,* 93 N. C., 611, and numerous others."

In *S. v. Spivey, supra,* at p. 686, continuing the quotation from that opinion in the main opinion, it says more, as follows: "*It becomes the duty of the trial judge to determine, in the first instance, if there is any evidence or if any inference can be fairly deduced therefrom, tending to prove one of the lower grades of murder. This does not mean any fanciful inference tending to prove one of the lower grades of murder; but, considering the evidence 'in the best light' for the prisoner, can the inference of murder in the second degree or manslaughter be fairly deduced therefrom.*" (Italics mine.)

Weighed by the above decision, I think that the inference in the present case as to a lower grade of murder, in the language of the *Spivey* case, fanciful. The defendant introduced no evidence. I think the evidence for the State found to be true beyond a reasonable doubt by the jury showed (1) a wilful, deliberate and premeditated killing; (2) committed in the attempt to perpetrate rape.

What is the evidence, carefully taken from the record? All the witnesses, including the physician who examined defendant, testified that in their opinion defendant knew right from wrong at the time and had sufficient intelligence to know right from wrong. *S. v. Potts,* 100 N. C., 457; *S. v. Journegan,* 185 N. C., 700. Alexander Tedder, a farmer, lived near Fremont, in Wayne County. He was the father of eight children. The oldest, Beulah Tedder, 14 years of age, weighed about

115 pounds; about dark, 6 o'clock, on the afternoon of 8 December, the father sent her with Cora Reid to the latter's home, some 2,200 feet away, to get some home-made syrup. The two in going the customary way passed defendant's home, about 1,200 feet from the Tedder home. The defendant's home was 900 feet from the Reid home. Along the route was a peach orchard and a pine thicket. Beulah had been gone about three-quarters of an hour, and looking out for his daughter's return, and seeing an object in the path about 35 or 40 yards from his house, the father went to it and found his daughter lying there dead. There was considerable blood at the place she was lying. She was flat on her back and her face slightly to one side, one of her legs was up under her and her dress turned backward toward her shoulders. There were two cuts on her left cheek. Her neck was cut all the way around the front. Her throat was cut. There were several cuts on her left hand, all across the fingers, one across the inside of her hand; some on the upper part of her arm, and in her right hand the flesh was torn entirely away from the bone and hanging down across her fingers. The little girl had not been ravished. Immediately steps were taken to find the murderer. The sheriff of the county and others started an investigation. The facts disclosed that Beulah and Cora Reid, in going to the latter's home for the syrup, passed defendant's home. Beulah, after remaining at Cora Reid's home about 5 minutes, left with a jar of home-made syrup, going back toward her home in the direction of defendant's home. About 25 or 30 minutes after Beulah left Cora Reid's home, defendant came there and remained 2 or 3 minutes and left. He had on a dark suit and a pair of overalls. The pathway for Beulah to go and return is along the edge of the woods in which are growing many small pines and bushes. In making her return home, in the woods was found where the blood started. It looked like a man and woman had been struggling on the ground; prints of their heels could be seen. The prints of people's toes and elbows were apparent at the scene of the struggle. The struggle appeared to be over an area of some 10 or 12 feet, and was about 10 steps from the path entering the roadway from defendant's house, some 125 yards up the path. At the scene of the struggle the bark was broken on a tree which looked as if the fingers had grabbed the tree to hold on. At the scene of the struggle the half-gallon of syrup was found and the little girl's bonnet. Boot tracks, and those apparently made by a girl, were observed. From this first struggle to where Beulah was found dead some blood along the pathway for a distance of 125 to 140 yards was found. Along the way from the first struggle were found signs of a girl's tracks as well as boot tracks following her to a point about 30 steps from the road leading toward the girl's home, and there it looked as if the man broke and ran across the field and the girl pro-

ceeded toward her home. The person in the boots would apparently catch up with the girl and another struggle would ensue. This was along a route 125 to 140 yards from the starting point. Going toward the Reid home, down the path, was found from where the little girl was lying in the little path, blood on down to the edge of the road; it dripped along to the peach orchard. In the path that cut the corner off the peach orchard was found where there had been a struggle, and there was found a puddle of blood; a little further on, going in the direction of the woods, was found where there had been another struggle, and in the woods, the path going in, was found that there had been a struggle in the woods, and there the last blood was found; that's where the blood started in the woods, where the first struggle commenced, as heretofore set forth.

From ascertaining the above facts, the officers went to defendant's home, followed the running tracks, and a knife was found under the edge of the house. This knife was in the shape of a woman's leg, and had a long, keen blade; it was very sharp and bloody. Upon searching the house a pair of boots and overalls, blood apparently fresh on both, were found. The overalls were hanging in a closet. The defendant was arrested and examined, and there was found a cut on his hand, the wound apparently a fresh one, and bleeding, and blood on his pocket. The defendant said he had some boots, and that he had been rabbit hunting that day, and had gotten blood on his boots off of the rabbit, and the overalls which he had left at home had been worn by him while dressing the rabbit, and if there was blood on them that it must have come from the rabbit. The officers went back to the scene of the struggle and fitted the boots in the tracks and found that the boots fitted exactly into the tracks, and fitted the running tracks. This test was made at several places, and in each place the boots fitted into the tracks.

Frank Aycock, on the morning after the murder, made an examination. He testified "That the path from the Tedder house to the road is about 200 feet, and that 110 feet from the house on the path he found a large pool of blood, which he thought was the place they found the child. One hundred and eighty-five feet further along the path, away from the home, he found another large pool of blood. That near the turn of the cartway leading to the Tedder home is a peach orchard, and that near the peach orchard he found the second pool referred to, and there was a little blood on the path between the two pools of blood referred to; that further away from the house, on the cartway is a patch of woods, and in the patch of woods, and about 15 feet off the cartway, was another pool of blood, and in the pine thicket there was a small amount of blood on the leaves. He also saw a bonnet near this place."

The confession of defendant to Dr. W. C. Linville, admitted in evidence, was as follows: "I asked him what caused him to do this, and he

said 'I don't know'; and I asked him if he cut the girl immediately after he came up with her, and he said he did not, but said he seized her around the waist, and she fought him off, and ran from him, and after he caught up with her he cut her. That was about all he said. He did say he cut her because she said she was going to tell her father."

*First,* all the evidence was to the effect that it was a wilful, deliberate and premeditated killing.

In *S. v. Daniel,* 139 N. C., at p. 554, quoting from Kerr on Homicide, sec. 72, it is said: " 'The celerity of mental action is such that the formation of a definite purpose may not occupy more than a moment of time, hence the important question in such a case is to determine whether the external facts and circumstances, at the time of the killing, as well as before and after that time, having connection with, or relation to it, furnished satisfactory evidence of the existence of a calm and deliberate mind on the part of the accused at the time the act was committed. If they show a formed design to take the life of the person slain, or to do him serious bodily harm, which in its necessary or probable consequence may end in his death, he is guilty of murder in the highest degree.' "

"The formation of a definite purpose may not occupy more than a moment of time." In *S. v. Benson,* 183 N. C., p. 795, it is said: "Premeditation means 'thought of beforehand' for some length of time, however short." *S. v. Walker,* 173 N. C., 780; *S. v. Holdsclaw,* 180 N. C., 731. "If the circumstances of the killing show a formal design to take life of deceased, the crime is murder in the first degree. *S. v. Walker, supra; S. v. Cain,* 178 N. C., 724; Michie, N. C. Code, 1927, at p. 1312, sec. 4200.

*Second,* all the evidence was to the effect that the killing was committed in the attempt to perpetrate rape. Under the statute, this is murder in the first degree. The charge complained of in the main opinion giving a new trial is based on defendant's confession, but that confession, analyzed, although in the latter part defendant says he cut her because she said she was going to tell her father, but the confession further says she fought him off and ran from him, and after he caught up with her he cut her. This, coupled with the other evidence, shows from beginning to end that it was in an attempt to perpetrate rape in the very teeth of the statute, and was murder in the first degree. The killing was an incident to the attempt. It is contended in the main opinion that the confession indicated premeditation and deliberation, and this was a fact for the jury to determine and not for the court; that if they found he killed her beyond a reasonable doubt, with premeditation and deliberation, he would be guilty of murder in the first degree, but if they should not so find, he would be guilty of murder in the second degree. I cannot so construe the confession. To my mind such a construction is attenuated and fanciful, and I think there was no evidence

of second degree murder or manslaughter sufficient to be submitted to a jury. It was a continuous assault in an attempt to commit rape, which by the statute is *per se* murder in the first degree. Even if the charge complained of was error, on all the facts and circumstances on the record, it was harmless.

In the *Spivey case* the record discloses a murder by lying in wait or an attempt to commit arson, which by the statute is *per se* murder in the first degree. In such case, and in the present case *rape,* set forth in the statute, the State is not required to prove premeditation or deliberation. The manner of doing the act necessarily involves premeditation and deliberation. I have cited the law in regard to wilful, deliberate and premeditated killing, for on that aspect the confession of defendant is the sole ground on which the majority of this Court grants a new trial. The question of premeditation and deliberation, from defendant's confession, I do not think arises. It is not sufficient to base any inference of murder in the second degree or manslaughter. So, conceding that the question of premeditation and deliberation is one for the jury, it is only so when there is any, or sufficient, evidence to present it.

Defendant's purpose, from all the evidence, was rape. He confessed to killing the little girl; he said that he seized her around the waist; she fought him off and ran from him; he caught up with her and cut her because she said she was going to tell her father. This statement, taken "in the best light" for defendant, I can deduce therefrom, like the learned judge in the court below, no inference of murder in the second degree or manslaughter. Then again, the identity of the defendant being established by his confession, as well as circumstantial evidence, all leads to one conclusion—a continuous assault, and that he killed in an attempt to commit a capital offense—rape.

Succinctly the facts: The details perhaps are unequalled in the annals of the State; where a white child, 14 years of age, made so heroic a fight with defendant, a negro man, for her virtue and honor, and won in the fierce battle. This little girl, about dusk, a December evening, was sent by her father to go with a woman living less than a half-mile away to get some home-made syrup. On the way the little girl passed defendant's home. He saw her, and the lust of the jungle overpowered him. He armed himself with a sharp knife that had a long, keen blade. He lay in wait for her in the woods, watching for her on her return home. He sprang at her like a panther for the prey, and seized her around the waist. The struggle of the child and man was terrific; they fought over an area of 10 or 12 feet. The struggle on the ground showed prints of their heels, toes, knees and elbows; the bark was broken on a tree, the appearance of fingers grabbing the tree to hold on, blood was left from this fierce struggle, and the half-gallon of syrup and the little girl's bon-

net lay there.  The little girl escaped, blood dripping along the way as she fled, and the man in boots pursued her, and another struggle and a puddle of blood, and then again she escapes, and the man in boots pursues her and a struggle again, then the boot tracks show where the defendant broke and ran, and the girl proceeds towards her home, but with her throat and neck cut all around and her arms and fingers cut up, and she falls in the home path and was there found by her father.  In this bloody condition dead, but pure and white as the driven snow.  This was the end of little Beulah Tedder and her heroic struggle.  The identity of defendant was not disputed.  He committed the foul deed in an attempt to ravish her, and the trail of blood and struggle from start to finish between defendant and the little girl was trailed some 125 or 140 yards.  When his lust was foiled, defendant, with the sharp knife he carried with him, cut her throat.  It was a continuous assault in an attempt to commit rape, and no evidence of second degree murder or manslaughter.  Refinements and technicalities should be brushed aside and trials should be had on their merits.  The trial in the lower court, under the facts and circumstances of this case, should not be weighed in "gold scales," but justice done to the dead as well as the living.

There is no place in this civilization for lynch law, but orderly government must prevail, founded on common-sense and conditions that surround the actors.  For the reasons given, I most earnestly dissent to awarding a new trial.  I can see no precedent effected by sustaining the verdict and· judgment of the court below, but only an incentive that orderly government shall be supreme and the guilty punished.

The courageous judge in the court below was firm to see that

> "When passion blows the breeze,
> Let reason guide the helm."